UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE DEWIGHT WEST,

     Plaintiff,

v.

CITY OF EASTPOINTE et al.,

     Defendants.

Case No. 23-12757
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [52]**

---

In July 2023, Andre West, through his LLC, bought an arcade and restaurant in Eastpointe, Michigan. When he failed to secure business, occupancy, and liquor licenses before hosting guests at the property, the City intervened and temporarily shut down the building. West sued.

His *pro se* lawsuit seeks to re-cast the standard enforcement of unremarkable municipal ordinances into civil rights violations, including infringement of the right to assemble and religious expression, unlawful searching and taking of property, and deprivation of due process of law. His effort is unsuccessful. Thus, Defendants' motion for summary judgment is GRANTED.

**I.**

Many of the salient facts in this case are not in dispute. Andre West is the sole member and owner of Amir JS Estates, LLC (ECF No. 52-6, PageID.1379) and Amir JS LLC (ECF No. 52-10, PageID.1538). On July 31, 2023, Amir JS Estates, LLC

purchased the property located at 21901 Kelly Road, in Eastpointe, Michigan. (ECF No. 1 PageID.4; ECF No. 56, PageID.1272; ECF No.52-10.) It sits in a "Neighborhood Mixed-Use District" under Eastpointe zoning rules, (ECF No. 52-2, PageID.1303), a classification that permits some commercial land use alongside residential properties. *See* Eastpointe Ordinances, § 4.04. The property, previously owned by Troy Ramroop, had been operating as a licensed restaurant and arcade, "Big Daddy Games," since November 2019. (*See* ECF No. 52-4; ECF No. 52-5.)

West took some steps to keep that business running. The same day the LLC purchased the property, West applied through the Michigan Liquor Control Commission (MLCC) for a transfer of Ramroop's liquor license for Big Daddy Games to Amir JS LLC. (ECF No. 52-10, PageID.1537–1538.) That LLC was created for the sole purpose of obtaining a liquor license for that property. (ECF No. 52-6, PageID.1390–1391.) And in August 2023, West contacted the Eastpointe Clerk's office to discuss how he could obtain a business license. (*See* ECF No. 52-8, PageID.1533.) The Clerk's office emailed him the business license application and relevant fee information. (*Id.*) The Clerk also advised West that Ramroop owed some delinquent property taxes on 21901 Kelly, which would have "to be paid off before a business license will be issued." (*Id.*)

Shortly thereafter, West paid the delinquent property taxes to the city (ECF No. 52-6, PageID.1411) and filed a "Business License Cancellation Request," indicating that the property was under new ownership so that Ramroop's name could

be removed from the business and West could properly seek a new business license himself. (ECF No. 52-9, PageID.1535.)

But there were complications. Although West knew the business license cancellation simply invalidated Ramroop's old license and was not a substitute for a new business license application of his own (*see* ECF No. 52-9, PageID.1535), West did not immediately apply for one. So after the cancellation, the property was unlicensed for business. (*See* ECF No. 52-6, PageID.1441, PageID.1446–1447, PageID.1474.) And when West sought to transfer Ramroop's old liquor license to himself, his application included a request to feature "topless activity"—an "adult use" of the property not permissible under the zoning rules without additional review and community input. *See* Eastpointe Ordinances, § 4.04; (*see, e.g.*, ECF No. 52-22 (MLCC letter noting that West submitted a "new Topless Activity Permit").) West also needed an occupancy license before anyone could, as the name suggests, occupy the building. And that license could not be issued without required fire and safety code inspections—inspections West put off until October 2024. International Fire Code §§ [A]105.3.1, [A]105.3.3, (adopted at Eastpointe Ordinances, § 20-19); (*see also* ECF No. 52-6, PageID.1418–1419; ECF No. 54, PageID.1743.)

In all, it is undisputed that on September 8, 2023, Big Daddy Games did not have a business license, liquor license, or occupancy license.

This is the day the City of Eastpointe received a complaint that Big Daddy Games appeared open (ECF No. 52-23, PageID.1611), and dispatched police officers to investigate if the business was operating without the requisite licenses. (ECF No.

52, PageID.1670–1671; ECF No.54, PageID.1671.) This is also where the parties' stories diverge. Two Eastpointe police officers, Defendants Alaa Hussein and D. Decker, arrived at the property at around 11 p.m. (ECF No. 52-12, PageID.1545; ECF No. 52, PageID.1670–1671; ECF No. 54, PageID.1671.) Their activity was captured on Decker's body worn camera. (ECF No. 52-15; Video Ex. N, Decker Body Cam (1); Video Ex. O, Decker Body Cam (2).)

From all appearances, the business looked open to the public. Hussein and Decker saw multiple cars in the Big Daddy Games parking lot. (*Id.* at 0:30–1:00.) The exterior lights were on. (*Id.*) The front door was unlocked and the officers walked through freely, as did many other patrons during the officers' visit. (*Id.* at 1:10–1:14, 4:30–4:35, 9:10–9:15, 10:10–10:15, 10:50–10:55, 13:01–13:05.) Inside the property the officers found what appeared to be a typical bar/restaurant. A few men worked security near the front door. (*Id.* at 1:25–2:45; *see also* ECF No. 54, PageID.1671.) Individuals appeared to be working behind the bar operating point of sale systems. (*Id.*)

The officers asked the security personnel if the manager or owner of the property was available. (*Id.*) Shortly thereafter, Jyotika Simmons—West's aunt—appeared and identified herself as the manager. (*See id.*; ECF No. 54, PageID.1671; ECF No.52-6, PageID.1379–1381.) The officers asked Simmons for a business license. (Video Ex. N, Decker Body Cam (1), 2:50–3:10.) Simmons said West "got everything submitted." (*Id.*) She denied serving alcohol—only "lemonade and food." (*Id.* at 5:15–5:20.) The officers were skeptical. (*Id.* at 6:13–6:35.) Unable to produce any licenses,

4

Simmons told the officers that West was on his way to the property and he would bring "everything that we need with him." (*Id.* at PageID.1572.)

So the officers left and came back two hours later. (ECF No. 52-12, PageID.1545.) When they returned, the establishment was much as they had left it: patrons were still eating and drinking inside, West was not present, and no one could provide the officers with a business license. (ECF No. 52-12, PageID.1545; ECF No. 52-16, PageID.1581–1582; *see generally* Video Ex. O, Decker Body Cam (2).) At this time, the officers saw liquor bottles behind the bar. (ECF No. 52-12, PageID.1545.) Simmons maintained she was not serving liquor, but admitted that she "let people bring [in]" their own "bottle" of liquor, and had even brought in some beer of her own. (*Id.* at PageID.1583–1584; *id.* at PageID.1573.) Officers tested "5 separate drinks in the bar" with a PBT device and the results were positive for alcohol. (ECF No. 52-12, PageID.1545.) So the officers shut down the operation and issued Simmons a citation for operating without a business license and serving liquor without a license. (*Id.*)

A few days later, on September 12, 2023, West, through his LLC, filed an application for a conditional liquor license with MLCC. (ECF No. 52-11, PageID.1540.) West and Simmons knew it could take upwards of "20 days" for that application to be approved. (ECF No. 52-15, PageID.1573 ("I don't know if the conditional [liquor license] came through yet, because, you know, they told him that when Troy – it takes about 20 days.")); *see also* ECF No. 52-14, PageID.1558 (Sargeant Ignace police report indicating that "On 9/15/23, [he] spoke with a representative from the Michigan Liquor License Commission" who reported that

5

West "had applied for the business and liquor licenses but the Commission had not met and / or granted any licenses.").)

But that did not stop West from hosting a gathering at the property just three days later, on September 15. The City had become aware that a party was to take place at Big Daddy Games that night, so Eastpointe Fire Marshal, Defendant Alton Polk, visited 21901 Kelly and left his business card on the door in the hope of discussing the licensing issues with West. (*See* ECF No. 52-13, PageID.1548.) Upon finding the card, West texted Polk to ask why it was left. (*See id.*) Polk advised that he was the city Fire Marshal and that he "would highly recommend that [West not] use the building at 21901 Kelly Road for any public or private events until all the proper licensing, zoning, fire and business inspections are done and approved by the City." (ECF No. 52-13, PageID.1549.) West indicated that the building was "private" and that his attorney advised him he could "invite anyone" to his building. (*Id.*) When Polk pointed West to the fire code provision requiring inspections prior to obtaining an occupancy license, West said that 21901 Kelly was his "home," which Polk advised was also against Eastpointe's code. (*Id.* at PageID.1551.)

That night, guests were back at Big Daddy Games. (ECF No. 52-14.) West admits to hosting a private "family and friends" celebration (ECF No. 54, PageID.1761–1762), but he, and at least one witness—security guard Micah Hollis—maintain that the party was closed to the public. (*See id.*) In fact, Hollis says West told him to lock the front door to the property and keep it locked throughout the event, and attests that he placed "Not open to the public" signs outside the front door of

6

21901 Kelly, at West's direction. (ECF No. 54, PageID.1757–1758.) West denies selling liquor or food at the party, but admits that on this occasion, he charged guests for ice and cups. (ECF No. 52-6, PageID.1416 ("We were not giving away anything, as far as liquids were concerned. If you needed ice, if you needed cups for your beverage, there was a small charge, maybe a dollar or two or something like that as it related to cups.").)

Police officers dispatched to the property and "observed the business to be open with patrons entering / exiting and congregating in the parking lot . . . patrons drinking alcohol from plastic cups and food was being served." (ECF No. 52-14, PageID.1559.) Police notified the Eastpointe Fire Department that 21901 Kelly appeared to be operating once again without the requisite licenses. So officials from the Fire Department went to the property. They "made entry" (ECF No. 52-14) to the building by breaking the locked front door. (ECF No. 54, PageID.1762.) They then helped the Police Department remove patrons and boarded up the building. (*See* ECF No. 52-14.)

A few days later, Eastpointe denied West's business license application, finding that a "dance hall/event hall" was not a permitted use under the mixed-use zoning rules of the district the property was located in. (ECF No. 52-18, PageID.1593.) Eastpointe's Zoning Commission nevertheless advised West that he could submit a new application "with a different proposed business type." (*Id.*)

West took them up on their offer. The next day, September 18, 2023, West, on behalf of Amir JS Estates LLC, finally submitted a business license application, this

time identifying the proposed business as a "Food/Music/Restaurant" venue. (ECF No. 52-19, PageID.1596; ECF No. 52-6, PageID.1407; ECF No. 54, PageID.1672.) At some point, the application was granted, and West's LLC currently holds a business license to operate Big Daddy Games as a restaurant. (ECF No. 54, PageID.1672.)

Not long after the September 15 incident, property inspections were conducted at 21901 Kelly which found several code violations. (ECF No. 54, PageID.1742–1744; *see also* ECF No. 52-26.) As a result, West was instructed to make various repairs. (*Id.*) He did so, and after re-inspection, West's LLC received a new, temporary certificate of occupancy. (*See* ECF Nos. 52-30, 52-31.) The record is unclear as to whether a permanent certificate of occupancy has since been issued. (*See id.*)

In December 2023, Eastpointe filed an objection with the MLCC to West's liquor license application, relying in large part on the September incidents in which the city believed West sold liquor without a license. (*See generally* ECF No. 52-23 (December 8, 2023, letter from the Eastpointe Chief of Police to Ken Pelland, the MLCC investigator handling West's application.).) Ultimately, the MLCC denied West's liquor license application. (ECF No. 52-22 (MLCC denial letter dated October 15, 2024).)

West concedes that there was activity at Big Daddy Games before he (and the LLC) obtained all the requisite business and occupancy licenses. (ECF No. 52-6, PageID.1417.) But he argues that the events on September 8 (into the early hours of September 9) and September 15 were mere private gatherings of his "family and friends." (ECF No. 52-6, PageID.1405–1407.) He maintains that he never sold liquor

8

without a license, but admits to selling "cups, ice, and food" on the 15th. (ECF No. 1, PageID.9.) In support, West provides the affidavits of two witnesses—both present on September 8–9, one present on September 15—that confirm his characterization of the events. (ECF No. 54, PageID.1755–1756 (Tinasi Simmons Affidavit); *id.* at PageID.1757–1759 (Micah Hollis Affidavit).)

Even if the September events were, as West says, mere gatherings of family and friends, the building was not certified for occupancy of any kind. In other words, whether entertaining friends, family, or strangers, an occupancy license was required. So West resorts to challenging the application of the city's occupancy and licensing requirements themselves. On October 30, 2023, West filed this lawsuit alleging that Eastpointe officials violated several of his constitutional rights when they shut down 21901 Kelly for failure to comply with Eastpointe's zoning and licensing rules. He alleges that his religion permits him to "dance to music, drink alcohol or minister to like minded people" and that he was engaged in these protected religious practices when the city shut him down on September 8–9 and September 15. And he claims that former Big Daddy Game's owner Ramroop, who is white, was not subject to the same enforcement scrutiny as West, who is Black. Accordingly, West alleges violations of the First, Fourth, Fifth, and Fourteenth Amendments (Counts I–IV), Municipal Liability (Count V), Civil Conspiracy (Count VI), and "Waiver of Immunity" (Count VII). (ECF No. 1.)

On May 1, 2025, following a substantial discovery period and unsuccessful efforts at settlement, the City of Eastpointe, and individual defendants Polk, Decker,

9

Hussein, and Ignace, filed a Motion for Summary Judgment (ECF No. 52.) Their argument has four main components: (1) West lacks standing to assert harms on behalf of his LLCs; (2) The individual defendants are entitled to qualified immunity on the federal claims; (3) West has failed to establish municipal liability under *Monell*; and (4) the undisputed facts entitle Defendants to judgment as a matter of law on West's state law civil conspiracy claim . (*Id.*)

## II.

The Court starts, is it must, with jurisdiction. Defendants argue that West lacks standing to bring any of the present claims because he only alleges injuries to his LLCs—Amir JS Estates, LLC (the entity that owns 21901 Kelly), and Amir JS LLC (the entity that applied for a liquor license on behalf of the business)—not himself.

The doctrine of standing demands a plaintiff assert his "own legal rights and interests" and not the "legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). So, as a general rule, "a shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation." *Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987), *rev'd en banc on other grounds*, 828 F.2d 1145. This extends to LLCs and their members. *See, e.g., Dockery v. Szymanski*, No. 22-11507, 2023 U.S. Dist. LEXIS 24833, at *10 (E.D. Mich. Jan. 24, 2023), *adopted in* No. 22-11507, 2023 U.S. Dist. LEXIS 23925 (E.D. Mich. Feb. 13, 2023) (citing *Vaughn v. Taylor*, No. 21-61, 2021 U.S. Dist. LEXIS 250788, at *9 (E.D. Tenn. June 15, 2021.))

10

"There is, however, a well-recognized exception to this rule precluding shareholders from bringing individual actions. 'Where the shareholder suffers an injury separate and distinct from that suffered by other shareholders,' or the corporation as an entity, the shareholder may maintain an individual action in his own right." *Gaff*, 814 F.2d at 315. Said another way, a member of an LLC retains standing to sue for injuries particular to them. *See, e.g., Olita v. McCalla*, No. 21-2763, 2022 U.S. Dist. LEXIS 92912, at *15 (W.D. Tenn. May 24, 2022) ("The only exception to this owners-can't-sue-based-on-harm-to-the-entity principle is 'where the shareholder suffers an injury separate and distinct from that suffered by other shareholders, or the corporation as an entity.'"); *see also Carrington v. Detroit Bldgs. Safety Eng'g & Env't Dep't*, No. 23-12978, 2025 U.S. Dist. LEXIS 35591, at *6 (E.D. Mich. Feb. 27, 2025); *Cruden Bay Holdings, LLC v. JPMorgan Chase Bank N.A.*, No. 21-1170, 2024 U.S. Dist. LEXIS 154375, at *5 (N.D. Tex. Aug. 27, 2024) ("Importantly, a member of an LLC or a shareholder lacks standing to sue individually where the cause of action belongs to the company, unless its alleged harm is distinct from harm suffered by the company.").

Here, West's attempt to establish distinct injuries is muddled, perhaps because he often fails to recognize that Amir JS Estates, LLC is a legally separate entity and that this entity owns the business and property at 21901 Kelly. (ECF No. 52-6, PageID.1508 (West stating, "I'm the sole owner of that property").) But West nevertheless maintains that he is not alleging harms to his LLCs, but personal harms

11

he experienced, "distinct from the cooperation [sic]," (ECF No. 52, PageID.1674), so the Court endeavors to consider them.

At the summary judgment stage, it is West's burden to establish, by sufficient evidence, that he has standing as to each cause of action. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In so doing, he may not rely on "mere allegations;" instead, he must "'set forth' by affidavit or other evidence, 'specific facts' which for purposes of the summary judgment motion will be taken to be true.'" *Id.* (citation omitted).

### A.

Begin with West's claims under the First Amendment. West alleges that Defendants' actions inhibited his free exercise of religion by making it harder for him to use 21901 Kelly to practice it. (*See, e.g.*, ECF No. 1, PageID.15.) This is a harm separate and distinct from that of the LLC. So West has standing to assert First Amendment claims.

### B.

West's claims under the Fourth Amendment are more difficult.

### 1.

At his deposition, West explained: "I'm claiming that [the officers] could not have came in and searched *my property* for an alleged crime without a warrant." (ECF No. 52-6, PageID.1503 (emphasis added).) But 29101 Kelly is *not* West's property—it is Amir JS Estates LLC's property. And under Michigan law, even a sole owner/member of an LLC, like West, has "has no interest in specific limited liability company property." Mich. Comp. Laws § 450.4504(2). So to the extent West's theory of injury is that "his property" was unlawfully searched, he fails to establish standing.

12

The same goes for his claim that "the limited liability company at issue was created by the plaintiff, and Plaintiff has 100% membership interest in the limited liability company . . . . As it shows today, Plaintiff's profit distributions has been greatly reduced." (ECF No. 57, PageID.1790.) West needs to show his injury is different from the LLC's injury—not derivative of it. *See Williams v. City of Detroit,* 2019 U.S. Dist. LEXIS 95895, at \*15 (E.D. Mich. June 7, 2019) (explaining that plaintiff's damages of "diminished returns on her investment" did not constitute a "separate and distinct injury" because that harm "solely derive[d]" from the injury to her LLC).

### 2.

Edified by Defendant's motion for summary judgment, West made a different argument in his response brief. (ECF No. 54, PageID.1674, PageID.1679, PageID.1695.) While he now admits he may not be the legal owner of the business and property at 21901 Kelly, he contends that he had, "at all times," an unspecified "possessory interest" in the property that gives him standing to sue. (*Id.*)

That is the entirety of the argument. West does not provide *any* evidence in support of the alleged possessory interest; no lease agreement, contract, or other proof that Amir JS Estates LLC granted him any legal right to occupy the property. Notably, West's affidavit makes no mention of a "possessory interest." To the contrary, he merely reasserts, incorrectly, that he is "the owner . . . of the property located at 21901 Kelly." (ECF No. 54, PageID.1760.) Even if West could prove he had a possessory interest in the property, however, his claimed injury from the officers'

13

warrantless entry into Big Daddy Games on September 8–9 would be indistinguishable from the LLC's injury.

**3.**

But West was present when the officers came back on September 15 and entered the premises without a warrant or permission. This, he says, injured him in a personal, distinct way.

At that time, argues West, he was occupying the space in his personal capacity and had control over 21901 Kelly to host a private gathering of his family and friends. And West testified that this invasion of his "privacy" harmed him personally: He says Defendants' invasion of his privacy caused him "emotional distress." (*Id.* at PageID.1674; *see also* ECF No. 54 at PageID.1761–1764.) He characterizes the incident as "harass[ment] by the Fire Marshal" (*id.* at PageID.1685), who West says pulled on the front door of the property "aggressively and hard for at least 3 minutes before the front broke open." (*Id.* at PageID.1762.) He claims to have suffered "severe depression, anxiety" and testified at his deposition that he has treated with a psychologist because he was "stressed out about this incident." (ECF No. 52-6, PageID.1516–1519.) His affidavit reports that he has "lost so much weight and have been unable to eat surrounding what has occurred with the City of Eastpointe." (ECF No. 54, PageID.1763.) These emotional injuries are plainly distinguishable from harm to the LLC.

The Court recognizes that the Fourth Amendment has its own separate "standing" test, which requires the Court to find that West had, on September 15,

14

2023, a reasonable expectation of privacy in the premises. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *see also Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."). But the Court will address this test when evaluating the merits of the Fourth Amendment claim. *See United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022) ("Fourth Amendment standing is a merits question, not a jurisdictional one.") For now, it is sufficient to say that West has alleged some injury separate from the LLC.

**C.**

West's Fifth Amendment takings claim involves similar standing concerns. It is recognized that leasehold interests, in addition to ownership interests, are protected property rights under the Fifth Amendment takings clause. *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 303 (1976). So a plaintiff need only establish "a colorable interest in the property," even short of ownership, to have standing under the takings clause. *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 485, 488–89 (6th Cir. 2021). Even construing the record in the light most favorable to West, including that he is the sole member of the LLC that owns the property and the business, it is unclear whether he meets this threshold.

But the Court need not resolve that issue. Because West has not shown that any harm to his interest is separate and distinct from that of the LLC that owns the property he alleges was taken. Indeed, West testified at his deposition that he "was deprived of property without notice . . . . My property that I owned . . . . It was unacceptable to me and that constituted taking." (ECF No. 52-6, PageID.1508.)

15

As discussed below, though, irrespective of whether West has standing to bring a fifth amendment takings claim, it does not withstand Defendants' summary judgment motion on the merits.

**D.**

The same is true for West's equal protection and due process claims under the Fifth and Fourteenth Amendments. Defendants do not appear to challenge West's standing to bring these claims (ECF No. 52, PageID.1278–1279), which arise from West's allegations that he was targeted by Defendants because of his race and dispossessed of his "right of use" of 21901 Kelly without due process. At least the former identifies an injury personal to West such that the Court will move to the merits. The latter, focused more on the impact to the property, suffers the same standing problems already addressed.

In sum, considering the Defendants' LLC standing argument, the Court finds that West has standing to bring claims under the First Amendment, the Fourth Amendment with respect to the September 15 entry, and the equal protection claim. But he lacks standing with respect to his Fourth Amendment claim involving the September 8 entry, the Fifth Amendment takings claim, and likely the due process claim.

Given the complexities in analyzing the standing issues on the present record, however, the Court will address the merits of all of West's claims.

## III.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021).

In making this determination, the Court must view facts in the record, and reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party—West. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This "'usually means adopting the plaintiff's version of the facts.'" *Tawney v. Portage Cnty.*, No. 21-3809 2022 U.S. App. LEXIS 16681, at *7 (6th Cir. June 15, 2022). However, where "undisputed video evidence is available," that "utterly discredit[s]" the plaintiff's story such that "no reasonable jury" could believe him, the Court may rely on that evidence in lieu of accepting Plaintiffs' account whole cloth. *See id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## IV.

The individual defendants—Decker, Hussein, Ignace, and Polk—seek summary judgment on the basis of qualified immunity. Having asserted this defense, the burden shifts to West to show its inapplicability. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) ("Although a defendant ordinarily bears the burden of proof for

17

an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity.").

This means West must show the following: (1) construing the facts in his favor, the officers' conduct violated one of his constitutional rights, and (2) that right was clearly established such that "every reasonable official would have understood that what he is doing violates that right." *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Failure to establish either entitles Defendants to qualified immunity. *See Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 764 (6th Cir. 2021). The Court may address the two prongs "in any order." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

### E. First Amendment

The Court will first address whether the individual Defendants are entitled to qualified immunity on West's First Amendment claims.

### 1. Free Exercise

The contours of West's free exercise claim are unclear. He says that "[o]n September 15, 2023, [he] was exercising his own personal religious beliefs and practices, as explained in No. 42 of the complaint." (ECF No. 54, PageID.1678.)[1] And that paragraph, relying on several passages from King James' Bible, accuses Defendants of violating West's "First Amendment religious and economic right to make an honest living, congregate, not forsake assembly, dance, drink, alcohol, and

---

[1] Recall that West was not present at 21901 Kelly on September 8–9 and therefore he cannot (and does not) argue he was engaged in religious practices at that date that were impeded by the defendant officers' conduct.

minister to likeminded people, without infringement or license, within his own persona/property" when they enforced Eastpointe's "zoning and planning ordinances, and other codes" against him. (ECF No 1, PageID.15.)

It is true that laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable. *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877–78 (1990). On its face, the regulatory scheme and ordinances West challenges are neutral and generally applicable to all property and business owners in Eastpointe.

So to prevail, West must show that these neutral laws nevertheless "substantially burden" his religious practices. *See Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007). This he cannot do. The record is devoid of any facts establishing that Eastpointe "effectively" barred West's exercise of religion. West was not precluded from buying or drinking liquor. Nor was he precluded from selling liquor or assembling with others. He simply was unable to sell liquor or invite guests to a property he did not own, *prior to* securing liquor and occupancy licenses. In other words, West was, at most, inconvenienced by Eastpointe's requirements. This may have made West's religious exercise "more expensive or difficult," but that does not render these regulations "substantial burdens" on West's religious practices. *See id.*[2]

---

[2] Discussed further below, West also asserts a First Amendment right to have topless dancing at his LLC's property. (ECF No. 1, PageID.19.) His complaint suggests this could be part of his religious rights, but he makes no such argument in his response brief. So the Court will only analyze this as a free speech claim.

## 2. Retaliation

Alternatively, West makes what appears to be a viewpoint discrimination argument, contending that he was targeted for "selective enforcement" (ECF No. 1, PageID.20), because Defendants deemed his "methods" of worship" "less important than traditional organized religions." (ECF No. 54, PageID.1678.) In support, West relies on *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), a case which he says "held that a city ordinance bann[ing] ritual animal sacrifice violated the 1st Amendment because it *singled out* the religious practices of one faith." (ECF No. 54, PageID.1678.) (emphasis added).

But West was not, as he claims, "singled out" because of his methods of worship (*Id.*) In fact, there is no evidence he was singled out at all. (*See, e.g.*, ECF No. 52, PageID.1283.) West was subjected to the same regulatory enforcement scheme that applies to all businesses and property owners in the City of Eastpointe—regardless of religion. (*Id.*) He was required to get a liquor license, as all purveyors of liquor in the State of Michigan must—regardless of the religious uses implicated. So there is also no genuine issue of material fact as to this claim.

## 3. Prior Restraint

In addition to his free exercise claims, West argues that the City's zoning requirements act as an unconstitutional prior restraint on his protected First Amendment right to run a business with "topless activity." (ECF No. 54, PageID.1675–1677.)

20

"While it is clear that topless or nude dancing is a protected form of expression, governmental entities may impose reasonable restrictions on the time, place, or manner of otherwise protected speech if those restrictions (1) have an independent basis not related to the content of that speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open alternative channels of expression or communication of the information." *Wojcik v. City of Romulus*, 257 F.3d 600, 613 (6th Cir. 2001) (citing Supreme Court cases); *see also Ent. Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 734 (6th Cir. 2005) ("Though protected by the First Amendment, 'nude dancing of the type at issue here is expressive conduct,' which falls 'within the outer ambit of the First Amendment's protection.' Such speech receives protection, 'of a wholly different, and lesser magnitude'") (citations omitted).

Eastpointe's restrictions on the location of adult businesses meet those criteria. The express purpose of these rules is to "to combat the "deleterious effects on both business and residential segments of the neighborhood" including blight and downgrading of property values." (ECF No. 52-3 (Eastpointe Ordinances, § 4.04(A)(3)).). The rules do not categorically bar adult uses of property in any single zoning classification—not even in districts zoned for "mixed use" like the one in which Big Daddy Games is situated. *See id.* Rather, they regulate "adult uses" of property based on their proximity to other sensitive places like schools and churches. *Id.* at § 4.40(A). And the rules contain a provision that allows the city council to waive *any* of the code's "limiting regulations" upon a showing of approval from 50% of the property owners within a 600-foot radius of the proposed adult use and a finding that

21

the use will not be contrary to the public interest. *Id.* at § 4.04(A)(4). As such, the rules leave open various channels through which topless dancing may be sought and approved.

To the extent West's complaint makes a facial challenge to the zoning regulations, it is incomprehensible and meritless. (*See* ECF No. 1, PageID.18–19 ("The City of Eastpointe's licensing, zoning planning, and application scheme . . . contrary to the rights concerning peaceful assembly and economic liberty . . . infringes upon property owners right to choose, its right of use of property . . . or follow his or her dream, which is protected under Fifth and fourteenth Amendment.").) More significantly, the issue is not addressed or supported in his summary judgment briefs. (ECF Nos. 54, 57.) West has failed to offer *any* reason as to why the applicable licensing, zoning, and inspection requirements are not rationally related to any legitimate government purpose. *See Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 692 (6th Cir. 2014). So the Court need not analyze the issue further.

In sum, no reasonable jury could find that Defendants violated any of West's First Amendment rights. The individual defendants are thus entitled to qualified immunity on Count I.

### F. Fourth Amendment

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. U.S. Const. amend. IV.

22

The Court now circles back to the Fourth Amendment's standing analysis. "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *See Rakas*, 439 U.S. at 143.

So in determining whether Defendants are entitled to qualified immunity on West's Fourth Amendment claims, the Court must determine whether West had a "reasonable expectation of privacy" in 21901 Kelly, notwithstanding his lack of ownership interest in it, and if so, whether the officers' conduct violated West's clearly established Fourth Amendment rights.

### 1. September 8 and 9

Consider first whether a Fourth Amendment "search" occurred on September 8–9 when officers entered Big Daddy Games.

"A search occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (citation omitted); *see also United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (likewise finding that a Fourth Amendment search "occurs when a government official invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy.'")

Although "the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises," the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation

in an individual's home." *New York v. Burger*, 482 U.S. 691, 699, 700 (1987). A business owner has no "reasonable" expectation of privacy in "'areas of [a business] where the public was invited to enter and to transact business.'" *Savoy v. United States*, 604 F.3d 929, 937 (6th Cir. 2010) (alteration original) (quoting *Macon*, 472 U.S. at 469 (1985)); *see also ABCDE Operating, LLC v. City of Detroit*, 254 F. Supp. 3d 931, 946–947 (E.D. Mich. 2017) (upholding warrantless search of adult cabaret and explaining that "'[s]ince the clubs were open to the public at the time the inspections occurred, they had no expectation of privacy, and the [city] inspectors, no less than ordinary patrons, were free to enter the clubs and observe all that was within plain view.'") (citing *1064 Old River Rd., Inc. v. City of Cleveland*, 137 F. App'x 760, 762 (6th Cir. 2005)).

West says Big Daddy Games was not open for business on the dates in question, and as such, the officers' conduct must be construed as an invasion into his private property. (ECF No. 54, PageID.1679–1688, PageID.1760 (Affidavit of Andre West).) In support, he provides the affidavits of two individuals who were present at 21901 Kelly Road on September 8 and 9.

The first affiant, Tinasi Nicole Simmons, states that she attended a "family and friends" gathering at 21901 Kelly on September 8 and 9, to which she invited "3 of [her] friends." (*Id.* at PageID.1755.) Tinasi[3] reports that "no liquor was being served at the location because [she] asked for some and was told there was none." (*Id.*) The

---

[3] The Court refers to Tinasi by her first name to avoid confusion with Jyotika Simmons.

second affiant, Micah Hollis, reports that he worked security at 21901 Kelly on September 8 and 9, where his duties were "to allow Andre West's family and friends of family in the building, inform the public that we were closed, check all people for weapons, and check IDs to prevent minors from entering." (ECF No. 54, PageID.1757.) Hollis "personally witnessed No Alcohol being served." (*Id.*)

The Court ordinarily must credit the non-movant's view of the facts at the summary judgment stage. But "where 'opposing parties tell two different stories, one of which is blatantly contradicted'" by record video evidence, the court may instead "'view[] the facts in the light depicted by the videotape.'" *Est. of Collins v. Wilburn*, 755 F. App'x 550, 553 (6th Cir. 2018) (quoting *Scott*, 550 U.S. at 380).

Here, Officer Decker's bodycam from September 8 and 9 blatantly contradicts West's version. The uncontroverted video footage shows a property that appears, in all respects, open to the public. (*See generally*, Video Ex. N, Decker Body Cam (1); Video Ex. O, Decker Body Cam (2).) The exterior and patio lights were on and the front doors unlocked. (*Id.*) The officers, like many patrons captured on the video, walked freely in and out of the restaurant. (*See, e.g.*, Video Ex. N, Decker Body Cam (1), at 1:10–1:14, 4:30–4:35, 9:10–9:15, 10:10–10:15, 10:50–10:55, 13:01–13:05.) The establishment's security guards, supposedly tasked with limiting entry to West's family and friends, said nothing of a private event to the officers, or *any* of the patrons who approached them while the officers stood by. (Video Ex. N, Decker Body Cam (1), 1:15–2:20.)

25

Simmons, the self-described "manager" of the property, told the officers that all the required business paperwork had been submitted—not that the establishment was closed for private use. (*Id.* at 2:50–3:10.) She claimed to be selling "lemonade and food"—not hosting a private party. (*Id.* at 5:15–5:20.) And she implicitly admitted the business was up and running when she asked the officers for advice: "So you think we should shut down [until the license is approved]?" (*Id.* at 13:55–14:10; ECF No. 52-15, PageID.1576.)

Even if the Court were to credit West's account and find that all the patrons and staff present at Big Daddy Games were merely his friends and family, this would not change the Court's conclusion, because "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Savoy*, 604 F.3d at 936. And as evidenced by the officers' unchallenged entry, 21901 Kelly, even if not "open for business," was certainly open to the public. Accordingly, no "search" occurred within the meaning of the Fourth Amendment when officers visited Big Daddy Games on September 8 and 9.

Further still, if West had a meritorious claim that the property was closed to the public on September 8 and 9, Simmons and the security guards' consent to the officers' entry would obviate the need for a warrant. *See, e.g.*, *Herschfus v. City of Oak Park, Michigan*, 150 F.4th 489, 498 (6th Cir. 2025) ("consent and exigent circumstances permit warrantless administrative searches, too, no less than warrantless police searches.") "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *See, e.g.*, *United States v. Jenkins*,

92 F.3d 430, 436 (6th Cir. 1996). And consent to search can be given by anyone that a reasonable officer would believe has "authority" over the property. *See id.*

There can be no doubt that the officers reasonably believed the security staff—who West, in his own words, hired to control admission to the property—were authorized to consent to their entry. (ECF No. 52-15, PageID.1563–1564.) The same goes for Simmons, who held herself out as responsible for the property in West's absence. *See also United States v. Spicer*, 549 F. App'x 373, 377 (6th Cir. 2013) (holding that a hotel manager had authority to consent to a search of the hotel's non-occupied rooms).

In sum, Big Daddy Games was open to the public on September 8 and 9 and therefore the officers' visit to the building did not constitute a Fourth Amendment search. Even if it did, however, the officers obtained the consent of West's security and management personnel to enter the building. So Defendants are entitled to summary judgment on West's Fourth Amendment claim as to the September 8–9 incident.

### 2. September 15

The September 15 incident presents a different story.

The parties dispute the essential facts and unlike the September 8-9 incident, there is no body camera footage to resolve that dispute. West maintains that on this occasion, extra steps were taken to ensure the property was closed off to the public. In his telling, "the door was locked," (ECF No. 52-6, PageID.1421), and "closed to the public" signs were posted outside the property. (ECF No. 54, PageID.1757.) Unlike

the September 8–9 incident where West's employees consented to the officer's entry, West says that on the 15th, Defendants' entry to the property was "forcible." Indeed, Hollis says the officers "broke in" through the locked front door. (*Id.* at PageID.1758.)

Defendants say otherwise. They say they "observed the business to be open with patrons entering / exiting and congregating in the parking lot . . . patrons drinking alcohol from plastic cups and food was being served." (ECF No. 52-14, PageID.1559.) But the police report does not appear to contradict West's allegation that the officers entered the property by force and without consent. (*See* ECF No. 52-14, PageID.1559 (September 15 police report stating, somewhat opaquely, "officers made entry in the above listed location").)

If Defendants' version is correct that the business was open to the public, the officers' entry on that evening may not have been an unreasonable Fourth Amendment search. But if West's version is credited, and the door was locked, signs were posted regarding "no public entry," only his friends and family were present, and offers made entry by force, West may have had a reasonable expectation of privacy in the locked property, and the officers' invasion of it may have been a Fourth Amendment search. *See, e.g.*, *United States v. Long*, 797 F.3d 588, 565 (8th Cir. 2015) ("When a commercial property is *not* open to the public, a reasonable expectation of privacy may exist.") (citing *United States v. Swart*, 679 F.2d 698, 701 (7th Cir. 1982)).

Defendants are correct, however, that the Court also needs to consider whether this entry was a permissible "special need administrative inspection" for which a

28

warrant was not required. *Generis Ent., LLC v. Donley*, 790 F. Supp. 3d 628, 647 (E.D. Mich. 2025), *aff'd* No. 25-1656, 2026 U.S. App. LEXIS 5197 (6th Cir. Feb. 19, 2026),

The law recognizes two ways a warrantless search may be reasonable when conducted for some non-criminal law enforcement purpose: (1) administrative searches with proper pre-compliance review, *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409 (2015), and (2) administrative searches of "closely regulated industries," *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970). Defendants say that the September 15 search falls within the latter category as a permissible, warrantless inspection within a closely regulated industry. (ECF No. 52, PageID.1287–1288; ECF No. 5 ECF No. 56, PageID.1777 ("The operation of a nightclub and the sale or consumption of alcohol are closely regulated industries.").) As such, Defendants say neither a warrant nor some "opportunity for precompliance review" was needed prior to their inspection on September 15.  (*See id.*)

Defendants are correct that the liquor industry has long been identified as "closely regulated." *Colonnade Catering Corp.*, 397 U.S. at 76–77. Indeed, Michigan has an extensive liquor control code (Mich. Comp. Laws. § 436.1101, *et seq*) that subjects liquor licensees to warrantless administrative searches. (*Id.* (citing Mich. Comp. Laws § 436.1217(2)).[4] But whether 21901 Kelly can be properly said to fall within this industry is a closer call.

---

[4] West's contention that he was not selling alcohol makes no difference. Michigan law regulates the consumption of alcohol on premises without a license. *See* Mich. Comp. Laws § 436.1913. And because the Court finds that this was an administrative search of a closely regulated industry, it need not consider West's

Prior to West, Big Daddy Games had a liquor license and was part of this highly regulated industry. (ECF No. 52-10, PageID.1537–1538.) Although West sought to transfer that liquor license to his LLC, that application was still pending on September 15, 2023. (ECF No. 52-10, PageID.1537–1538 (noting West applied for a liquor license in July 2023); ECF No. 52-22 (MLCC denial letter dated October 15, 2024).) So technically, West was not yet a *liquor licensee* subject to inspection under Michigan Law when Defendants inspected his property.

And it is not clear whether *Colonnade* and its progeny apply to non-liquor license holders. In other words, while the "closely regulated industry" exception clearly applies to liquor license *licensees,* it is not clear that this also applies to *applicants* for liquor licenses. *See, e.g.*, *Burger*, 482 U.S. at 700–01 (reasoning that operators in closely regulated industries, licensed pursuant to federal laws, enter those industries "with the knowledge" that they will thereafter "be subject to effective inspection"); *Generis Ent., LLC*, 2026 U.S. App. LEXIS 5197, at *5 (noting that MLCC regulations provide for inspection of liquor license holders).

It certainly seems possible that a liquor license applicant, like a license holder, has "voluntarily chosen to subject himself to a full arsenal of governmental regulation" through his application and thus may be said to fall within the *Colonnade* exception. *See Marshall v. Barlow's Inc.*, 436 U.S. 307, 313 (1978). But the parties have not provided any case confirming this read of the doctrine. Thus, even assuming

---

argument about administrative searches requiring pre-compliance review. (*See, e.g.*, ECF No. 54, PageID.1684–1685.)

a fact issue on whether the September 15 search violated West's Fourth Amendment rights, this case can be decided under the clearly established prong of the qualified immunity defense, where the Court turns next.

### 3. Clearly Established

To overcome qualified immunity, West must do more than show Defendants violated his Fourth Amendment rights—he must show that they violated a right that was "clearly established." This means that the caselaw would have made clear to Defendants "that [their] conduct was unlawful in the situation [they] confronted." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (quotation omitted); *see also Generis Ent., LLC*, 2026 U.S. App. LEXIS 5197, at *8–9 ("We begin by assessing whether there was a clearly established rule stating that Trooper Bitner's warrantless search of Retro Rocks was unconstitutional at the time it occurred.") "[I]f there can be reasonable disagreement" about whether the officer's conduct was unlawful based on the law at the time of the incident, "then the right cannot be considered 'clearly established.'" *Armstrong v. City of Melvindale*, 432 F.3d 695, 701 (6th Cir. 2006). Stated another way, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). West bears the burden of pointing to some authority that "clearly establishes" that officers' violated his constitutional rights. *See Cunningham*, 994 F.3d at 764–65.

The law is clearly established "that an officer violates the Fourth Amendment when he pretextually uses an administrative search for no reason other than to

31

conduct a criminal investigation without a warrant." *Generis Ent., LLC*, 2026 U.S. App. LEXIS 5197, at *13. West makes such a pretext argument. (ECF No. 54, PageID.1760.) With respect to the September 15, 2023, incident, West avers that he "personally believe[s] that on [September 15] of 2023, administrative ordinances were used as a pretext to come to my property and search for criminal activity." (ECF No. 54, PageID.1760.) But West's "personal belief" is not supported with any evidence. In fact, there is no evidence in the record that West or his LLCs were being investigated for criminal activity other than ordinance and license violations.

Consider first the Fire Marshal's reasons for entry. The Court (and West) need not speculate as to the Fire Marshal's motivations—he relayed them to West directly. The two exchanged text messages in which Fire Marshal Polk said, "I would highly recommend that you don't use the building at 21901 Kelly Road for any public or private events until all the proper licensing, zoning, fire and building inspections are done and approved by the city." (ECF No. 52-13, PageID.1549.) He also told West that the business license and fire and building inspections had not been completed such that West was "violating fire codes and city ordinances pertaining to the adopted code." (*Id.* at PageID.1550.) And he gave this final warning, "[u]ntil this matter is sorted out and all proper licensing and inspections are completed, I urge you to not hold any public or private events at the address of 21901 Kelly, Eastpointe MI 48021." (*Id.* at PageID.1551.) In sum, the record contains no evidence of a pretextual search by the Fire Marshal.

32

The same goes for the individual police officers. There is no dispute that Michigan's regulatory scheme prohibits the consumption of liquor on non-licensed premises. *See, e.g.*, Mich. Comp. Law § 436.1913 (1)–(5). It also permits law enforcement to inspect premises licensed to sell liquor "during regular business hours or when the licensed premises are occupied by the licensee or a clerk, servant, agent, or employee of the licensee." *Id.* § 436.1217(2); *see also Russo v. Massullo*, Nos. 90-3240, 90-3241, 1991 U.S. App. LEXIS 3861, at *9–10 (6th Cir. Mar. 5, 1991) (recognizing that "[s]ince the liquor industry is a pervasively regulated industry, a legislative body can provide for a warrantless administrative inspection of liquor establishments") (citing *Colonnade Catering Corp.*, 397 U.S. at 72.) Buts discussed above, the law is not clearly established as to whether this applies to liquor license *applicants* or those permitting the consumption of alcohol on commercial premises.

Here, the record establishes that the officers believed they were conducting an authorized inspection of a premised involved in the liquor industry.  Only a few days earlier, on September 8, Decker and Hussein discussed the purpose of their visit to the very same premises: "I guess this place is supposed to be closed right now . . . I don't even think they're supposed to be open. That's what JZ said. . .  Just going to walk in and check the place out . . . see if they got a business license." (Video Ex. N, Decker Body Cam (1), 0:35–:1:14; ECF No. 52-15, PageID.1563.) Thus, after they arrived, most of their conversation with manager Simmons focused on whether West had a valid business or liquor license. (*See generally* Video Ex. N, Decker Body Cam (1); Video Ex. O, Decker Body Cam (2).)

33

Fast-forward a few days, to September 15. Here again, nothing in the record suggests that the police officers' inspection was for a purpose other than learning whether 21901 Kelly was conforming to the liquor laws. Not one week earlier, the officers encountered a similar gathering in which alcohol was being consumed on the premises even though the manager could not produce a liquor license. Officer Ignace's police report of the September 15, 2023, incident states that 21901 Kelly Road "is currently not supposed to be operating for business per the Liquor Control Commission." (ECF No. 52-14, PageID.1557.) More to the point, he stated "Officers were advised to check the above listed location to observe if any activity was taking place." (*Id.*) So West's pretext argument fails here, too.

In short, there is no genuine issue of material fact that the Defendants' entry was anything other than an administrative search of what they believed was a closely regulated business, limited to the enforcement of the applicable codes and ordinances and thus, not a pretextual search.

Additionally, the law is also clearly established that an otherwise proper administrative search may still violate the Fourth Amendment if conducted in an unreasonable manner. *See Donovan v. Dewey*, 452 U.S. 594, 598 (1981); *see also Tundidor v. Hernandez*, No. 23-22747, 2024 U.S. Dist. LEXIS 200922, at *43 (S.D. Fla. Nov. 5, 2024). West makes such a challenge. He characterizes the officers' conduct on September 15 as "aggressive." (ECF No. 54, PageID.1762.) To show that the officers' conduct ran afoul of the clearly established law here, West relies on *Club Retro LLC v. Hilton*, 568 F.3d 181, 198 (5th Cir. 2009). But in that case, "forty Rapides

Parish deputy sheriffs—some outfitted in full S.W.A.T. gear and black ski masks—. . . stormed Club Retro with shotguns, AR-15 assault rifles, and pistols drawn and pointed at both patrons and employees." 568 F.3d at 191.

That was not the situation described here. At most, the affidavits of West and security guard Hollis establish that Polk and others pulled on the front door "aggressively and hard for at least 3 minutes before the front door broke open," (ECF No. 54, PageID.1762), they then "searched through the kitchen and throughout the building," and "ordered everyone to leave the premises." (ECF No. 54, PageID.1758.) While perhaps invasive, this is a far cry from *Club Retro LLC*, where there was a massive armed raid that involved assaults, threats, and prolonged detention. 568 F.3d at 200.[5]

In sum, West has not pointed to any law that "clearly established" that on the facts present here, the police officers could not conduct a highly-regulated-industry-inspection of a perceived liquor seller. Thus, summary judgment is also warranted as to West's Fourth Amendment claim arising from the September 15, 2023, incident.

---

[5] West also claims the Fire Marshal failed to comply with the Fire Code, which says, in relevant part, that if premises are occupied, the fire official must request entry before completing an inspection. (ECF No. 57, PageID.1793; *see also* ECF Nos. 52-28, 52-29 (citing IFC 104.3).) While he says the Fire Marshal broke the door, West does not aver that he did not first request entry. In any event, West provides no case law that clearly establishes such a failure to comply with the fire code makes the search unreasonable.

### G. Fifth Amendment

Count III of West's complaint contains several claims arising under the Fifth Amendment. Two of those claims—West's Fifth Amendment due process and equal protection claims—are easily disposed of. (*See* ECF No. 54, PageID.1691.)

### 1. Due Process and Equal Protection

The Fifth Amendment's due process and equal protection guarantees only circumscribe conduct of the federal government. Defendants are all state entities or officials. *See Scott v. Clay Cnty., Tennessee*, 205 F.3d 867, 873 n.8 (6th Cir. 2000). As such, due process and equal protection claims against them are properly raised under the Fourteenth Amendment (discussed below). So the Court turns to the only viable Fifth Amendment argument remaining—West's takings claim.

### 2. Takings

The Fifth Amendment takings clause prohibits the government from taking private property for public use without "just compensation." U.S. const. V amend. A constitutional "taking" most obviously occurs when the government physically appropriates property. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148–49 (2021). A taking may also occur, however, when a regulation restricts one's use of their property to such a degree that it effectively amounts to a physical taking. *Id.* Courts have developed two tests for evaluating whether such a "regulatory taking" has occurred: (1) when the challenged regulation destroyed "all economically beneficial uses" of a property, or (2) through balancing a set of factors outlined by the Supreme Court in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978). *Hart v. Twp. of Presque Isle*, 761 F. Supp. 3d 1011, 1028–29 (E.D. Mich. 2024). Those factors

are: (1) the character of the governmental action, (2) the economic impact of the regulation, and (3) the law's degree of interference with distinct investment-backed expectations. *Id.*

West claims to have suffered a taking in two ways: first, when he was denied "prior non-conforming use" of 21901 Kelly and second, when the Fire Marshal reduced 21901 Kelly's approved capacity from 250 to 100. (ECF No. 54, PageID.1689–90.) Neither is a legally cognizable "taking."

"Prior non-conforming use" is a legal term of art that refers to circumstances in which zoning ordinances change *after* a property owner has established a certain use of their property. *See, e.g., Moskovic v. City of New Buffalo*, No. 23-1165, 2023 U.S. App. LEXIS 33273, at *6 (6th Cir. Dec. 14, 2023). It does not, as West seems to think, refer to selective enforcement of the same zoning regulations across multiple owners. West has not alleged that the zoning ordinances applied to his property changed in the time since Ramroop's ownership. So this argument fails as a matter of law.

The same is true for West's claim regarding 21901 Kelly's capacity reduction. As an initial matter, it is not clear if the property's capacity remains reduced to 100. West alleges the capacity reduction occurred in November 2023, but Defendants point out that at some time thereafter, West "made multiple changes to the interior of the structure," so the building was re-inspected and a new "temporary certificate of occupancy" was issued. (ECF No. 52, PageID.1276; ECF No. 52-31.) Neither party

37

clarifies what happened thereafter. So 21901 Kelly's 250-person capacity may have already been restored.

In any event, this capacity reduction plainly does not satisfy either test for a regulatory taking. A mere reduction in capacity does not destroy "all economically" beneficial uses of the property. West could still host up to 100 guests within the building and thus profit from their patronage.

A balancing of the *Penn Central* factors leads to the same result. The "nature" of the action is relatively minor. Upon finding several fire code violations at Big Daddy Games, the Fire Marshal did not shutter its doors entirely, but merely reduced the number of people permitted inside. This was apparently done for a legitimate public purpose—to protect the public from fire risks. *See Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 457 (6th Cir. 2009) (considering the "legitimate public purpose" served by the challenged regulation). This did not deny West total use of the property but merely "restrict[ed]" his use—perhaps only temporarily. *Id.* at 455–457. So this factor weighs against finding a taking.

As to the economic impact of the reduction, West has provided no evidence to support his claim of lost revenues, or the extent of those losses. This is not to suggest that the reduction "had *no* economic impact on [West's] Property or investments. But, in response to Defendant[s'] motion for summary judgment, [West has] the burden to set out specific facts showing 'a genuine issue for trial.'" *Hart*, 761 F. Supp. at 1029 (emphasis original). And unsubstantiated assertions are "not evidence." *See id.*

Nor did the action interfere with any "investment-backed expectations" of West. He has not argued that his LLC purchased the property in reliance on an anticipated 250-person capacity. And even if he did, an expectation that he be permitted to continue violations of a city's fire codes without consequence is unreasonable. *See Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 456–57 ("unilateral expectations and abstract needs are not sufficient to raise takings concerns").

As such, there is no genuine issue of material fact regarding whether any city action constituted a "taking" under the Fifth Amendment.

### H. Fourteenth Amendment

That leaves West's equal protection and due process claims under the Fourteenth Amendment—Count IV of his complaint.

### 1. Due Process

Begin with West's due process claim.

Whether an individual has been deprived of due process within the meaning of the Fourteenth Amendment is a two-part inquiry. First, the Court must determine if West has asserted a "protected property or liberty interest" to which due process protections apply. *Wojcik*, 257 F.3d at 609. Only if a protected interest is identified does the Court proceed to step two—evaluation of whether West was afforded due process before he was deprived of that protected interest. *Id.*

Whether a person has a protected "property" interest within the meaning of the Fourteenth Amendment is a question of state law. *Golf Vill. N. LLC v. City of Powell, Ohio*, 826 F. App'x 426, 432 (6th Cir. 2020). To have a protected property

right, like a certificate of occupancy, an individual must have more than a mere "desire for it or unilateral expectation" of it. *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008). Rather, he must have a 'legitimate claim of entitlement' or a 'justifiable expectation' to the claimed right. *See Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992).

Set aside for a moment that West is not the owner of 21901 Kelly. Even if he was, West would not have a legitimate claim of entitlement to occupy this property without an occupancy license, because Eastpointe's fire code does not permit it. *See* Eastpointe Ordinances, § 20-19 (adopting the 2015 International Fire Code); *see* International Fire Code § [A] 105.3.3 ("The building or structure shall not be occupied prior to the fire code official issuing a permit and conducting associated inspections indicating the applicable provisions of this code have been met."). Nor does the code leave the fire marshal any discretion to grant occupancy licenses in the absence of an inspection. (*Id.*) Put simply, West cannot have a "legitimate" claim of entitlement to a use of the property that would violate the law. Nor did he have a legitimate claim of entitlement to an occupancy license unless and until he passed the required inspections. *See Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 648 (6th Cir. 2015) ("Under Michigan law, Plaintiffs . . . had a legitimate claim of entitlement to the workshop [certificates of occupancy], *so long as the workshop passed the Village's inspection*") (emphasis added); *Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 469 (6th Cir. 2008) (holding that a property owner did not have a protected property interest in a building permit until it was granted); *Dorr v. City of Ecorse*, 305 F. App'x

40

270, 275 (6th Cir. 2008) (holding that plaintiff had a vested property interest in obtaining a certificate of occupancy where he *"passed all relevant building code inspections"* and obtained a signed court order from the state court directing the city to give him a certificate of occupancy) (emphasis added); *Braun*, 519 F.3d at 563 ("in order to establish a property right in a future, rezoned land use, an individual 'must point to some policy, law, or mutually explicit understanding that both confers the benefit[] and limits the discretion of the City to rescind the benefit.'") (alteration in original); *see also Carpman Fitness, LLC v. Royal Oak*, No. 08-13207, 2008 U.S. Dist. LEXIS 94959 at *16–17 (E.D. Mich. Nov. 14, 2008) ("Plaintiff cannot assert a claim upon a license it never held, and thus it suffered no deprivation of a property interest for purposes of constitutional due process protection.").

Without a "legitimate entitlement" to an occupancy license, West has no viable procedural due process claim.

### 2. Equal Protection

West also takes issue with the Fire Marshal's decision, after an occupancy inspection, to reduce the approved capacity for 21901 Kelly from 250 to 100 people. (ECF No. 54, PageID.1691.) West attributes the decision to his race. While his complaint does not expressly allege race discrimination, West clarified through his deposition and response brief that his equal protection theory is—at least in part— based on race discrimination. (ECF No. 52-6, PageID.1511–1512; ECF No. 54, PageID.1691.)

41

Defendants contend there is no evidence that they treated West differently from any similarly situated person because of his race. (ECF No. 52, PageID.1293.) West's bare allegations of differential treatment fail to create a genuine issue of material fact. *See Haliburton v. City of Ferndale*, 653 F. Supp. 3d 377, 405 (E.D. Mich. 2023) ("[T]he fact that the defendant is white and the plaintiff is non-white, even coupled with allegations that the defendant treated other similarly situated persons more favorably than the plaintiff, are insufficient to show discriminatory intent 'unless accompanied by some evidence' that the defendant actually gave preferable treatment to 'similarly situated [persons] of a different race'" (quoting *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009)).

To start, West offers no proof that he was treated differently. He simply alleges that former Big Daddy Game owner Ramroop, who is white, was also non-compliant with the fire code, but was nevertheless permitted to maintain an occupancy of 250 for three years, while West, who is Black, was not shown the same lenience. (ECF No. 1, PageID.10; ECF No. 54, PageID.1692.) Even setting aside that the proper comparison is the LLC and Ramroop, not West and Ramroop, nothing in the record confirms that Ramroop was excused from the fire code requirements, or that Ramroop and West were noncompliant in the same way. (*See, e.g.*, ECF No. 52-6, PageID.1511 (West describing the various repairs and changes he was required to make that he says Ramroop did not have to do).)

Nor does West prove "racially discriminatory intent or purpose." *Jon Jon's, Inc. v. City of Warren*, 700 F. App'x 436, 442 (6th Cir. 2017). Evidence of this

42

discrimination may be circumstantial, but it must demonstrate a "clear pattern" that the action taken is "unexplainable on grounds other than race." *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Paterek*, 801 F.3d at 650 (finding plaintiffs survived summary judgment on a race discrimination claim where they pointed to "a number of incidents concerning businesses that were allowed to operate without a [certificate of occupancy], or were issued a COO after a failed inspection, or were not subjected to inspection prior to being granted a COO when the business had previously been operated under different ownership.") Again, the record contains many safety reasons for Defendants' actions that have nothing to do with race.

West also provided some reasons. In his deposition, West says he was "treated differently as a result of [him] filing this lawsuit." (ECF No. 52-6, PageID.1514.) When asked directly if race was the reason for his different treatment, West simply speculated, "It's possible that they have [discriminated based on race]. I can't discredit it. I can't, you know." (*Id.*) And he ultimately conceded, "I don't know what was said behind the scenes or whatever, but to lower my capacity for what reason, *I don't have a clue.*" (ECF No. 52-6, PageID.1514 (emphasis added).) Exactly.

For these reasons, Defendants are also entitled to qualified immunity on West's equal protection claim.

*    *    *

In sum, Defendants are entitled to summary judgment as to West's First Amendment, Fifth Amendment, and Fourteenth Amendment claims in full, and as to

43

West's Fourth Amendment claims arising from September 8–9, but not as to West's Fourth Amendment claim arising from September 15.[6]

### V. Municipal Liability

West also seeks to hold the City of Eastpointe directly liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). This analysis is narrowed significantly by the foregoing analysis because there can be no *Monell* liability where there is no constitutional violation. *See, e.g., Martinez v. Wayne Cnty., Michigan*, 142 F.4th 828, 844 (6th Cir. 2025). Because West's claims under the First, Fifth, and Fourteenth Amendments are subject to summary judgment, West's corresponding *Monell* claims fail as well. That leaves only the question of municipal liability for the individual defendants' actions on September 15.

"A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Only when "execution of a government's policy or custom . . . may fairly be said to represent official policy," that inflicted the plaintiff's injury may the municipality be liable. *See Monell*, 436 U.S. at 694. A plaintiff can make this showing in four ways: "(1) [through] the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate

---

[6] West's complaint also contains takings and due process claims against Eastpointe Zoning Administrator Brigitte Smith, who was dismissed from the case by stipulated agreement (ECF No. 24). So the Court did not address those already-dismissed claims.

training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Harris v. County of Wayne*, No. 23-10986, 2025 U.S. Dist. LEXIS 265186, at \*32 (E.D. Mich. Dec. 23, 2025).

In his response brief, West appears to have narrowed his focus to a policy or custom theory of municipal liability, contending that Eastpointe has engaged in a policy or practice of denying "non-conforming usage rights" regarding capacity limits to three other businesses. (ECF No. 54, PageID.1697.) But this does nothing to support municipal liability for the sole remaining constitutional claim—the September 15 Fourth Amendment violation. Indeed, West makes *no* argument that the City is liable for the violations of his Fourth Amendment rights. (*See id.*)

Accordingly, West's municipal liability claims are dismissed.

## VI.

That leaves West's civil conspiracy claim under Michigan law. (ECF No. 1, Count VI.) While the Court has disposed of all the federal claims, for purposes of summary judgment it will exercise its supplemental jurisdiction and address this claim as well.

West primarily accuses Defendants Hussein and Decker of conspiring to violate his Fourth Amendment rights (ECF No. 1, PageID.41.) But police officers within the same department are part of the same "legal entity" and thus are legally incapable of "conspiring" with one another. *See, e.g.*, *Barrow v. City of Hillview, Ky.*, 775 Fed. Appx. 801, 806–07 (6th Cir. 2019); *see also Upton v. City of Royal Oak*, 492

45

Fed. Appx. 492, 503–05 (6th Cir. 2012) (noting that Michigan has adopted the intra-corporate conspiracy doctrine). So that theory of conspiracy is without merit.

To the extent West alleged in his complaint that the fire department defendants conspired with the police officer defendants, (ECF No. 1, PageID.41), the Court has not been pointed to anything in the summary judgment record to counter the Defendants contention that "[t]he record evidences parallel conduct compatible with and explained by lawful behavior consistent with enforcement of the law, codes and ordinances of the City." (ECF No. 52, PageID.1295.) At his deposition, West described the evidence he has in support of his conspiracy claim as "the fact that the [liquor] licensing official didn't follow her duties." (ECF No. 52-6, Page.1513.) This has nothing to do with the conduct of the Defendants here. So there is also no genuine fact issue on West's civil conspiracy claim and Defendants are also entitled to summary judgment on Count VI.

## VII.

In sum, Defendants' motion for summary judgment (ECF No. 52) is GRANTED as to all Courts.

Additionally, having reviewed the materials the parties submitted, West's motion for leave to file a sur-reply (ECF No. 57) is GRANTED.

IT IS SO ORDERED.

Dated: March 31, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE